190 So. 351

**LAWRENCE v. SUTTON–ZWOLLE OIL CO., Inc., et al.**

No. 35172.

May 29, 1939.

Rehearing Denied June 26, 1939.

Pujo, Hardin & Porter, of Lake Charles, for intervener Dr. D. C. Iles, appellant.

McCoy, King & Jones, of Lake Charles, and David M. Ellison, of Baton Rouge, for defendants appellants.

Cline, Thompson, Lawes & Cavanaugh and Liskow & Lewis, all of Lake Charles, for plaintiff and intervener William T. Burton, appellees.

Griffin T. Hawkins, for intervener L. G. Menuet, appellee.

FOURNET, Justice.

Plaintiff, Charles H. Lawrence, Jr., instituted this suit against James G. Sutton, Robert J. Boudreau, and Robert R. Stone individually and against two corporations of which they constitute the entire board of directors, namely, the James G. Sutton Oil Company, Incorporated and the Sutton-Zwolle Oil Company, Incorporated (hereinafter referred to as the Sutton Company and the Zwolle Company respectively), seeking to annul and set aside a purported assignment by him to the said Sutton, Boudreau, and Stone of certain oil and gas leases affecting property located in the Parish of Sabine bearing date of October 25, 1937, and an assignment by them of the said leases to the Zwolle Company dated February 4, 1938, and also to reform a verbal contract alleged to have been entered into between him and the Sutton Company for the development of the leases for a stipulated consideration, and, as reformed, that the Sutton Company be compelled to accept the same.

For cause of action, plaintiff alleged that he procured the block of leases in controversy, covering and affecting certain lands situated in Township 7 North, Range 14 West, of Sabine Parish, Louisiana (hereinafter referred to as the Sabine leases), and, in order to have the same developed, some time during the month of October of 1937, he entered into a verbal agreement with the Sutton Company, represented by its board of directors and officers (Sutton, Boudreau, and Stone), whereby he agreed to assign the leases to the Sutton Company, the consideration therefor being the assumption by it of the drilling obligations of the several lease contracts, and, further, to reimburse plaintiff the expenses incurred by him in securing the leases, aggregating $770, and to pay him the additional sum of $50,000 out of the value of any oil, gas, or other minerals that might be produced from any of the lands covered by the leases; that on the 25th of October, 1937, he signed a sheet of paper prepared by Robert R. Stone as Secretary-Treasurer of the Sutton Company, which was explained to him at the time to be sufficient evidence to carry out the agreement to transfer the leases to the Sutton Company, but that on March 4, 1938, he was informed that there was placed of record in the conveyance records of Sabine Parish a document pur-

porting to be an assignment by him of the several leases to Sutton, Boudreau, and Stone individually, instead of to the Sutton Company; that upon investigation he discovered that Sutton, Boudreau, and Stone, intending to defraud him, altered and changed the instrument signed by him so as to indicate that the intended transfer was to be in favor of the individuals, and, further, that two paragraphs were added to the page signed by him describing certain mineral leases which he had never agreed to or intended to transfer either to the said individuals or the Sutton Company; that on February 3, 1938 Sutton, Boudreau, and Stone, pursuant to their conspiracy to defraud plaintiff, organized the Zwolle Company with themselves as the sole subscribers to the stock thereof and on the next day executed an act assigning the leases in controversy to the company in consideration of the issuance by it to each of them of 120 shares of its capital stock of the par value of $100. The plaintiff further alleged that he was persuaded by Sutton, Boudreau, and Stone, as officers of the Company, to consent to accept an oil payment of $4,000, plus $1,000 cash, instead of $50,000 as originally agreed, on the false representation by them that the corporation had entered into an agreement with William T. Burton to develop the leases jointly with the Sutton Company and that it could not carry out its agreement with him with regard to the $50,000 oil payment because of the objection of Burton thereto.

The defendants filed an exception of vagueness, asking for a bill of particulars, which was never argued because plaintiff

promptly and satisfactorily supplemented his petition. The defendant Sutton Company then filed exceptions of no cause and no right of action, which were overruled by the trial judge. While these exceptions of no cause and no right of action were pending, and prior to an answer having been filed by any of the defendants, Lawrence G. Menuet, asserting his right as a stockholder of the Sutton Company, intervened, joining the plaintiff in his demands. The allegations of his petition are practically the same as those of the plaintiff, with the addition that he stated that the funds of the Sutton Company had been expended in procuring and in drilling the said leases.

Two more interventions were filed, one by William T. Burton, claiming to have a half interest in the production under the leases, in accordance with an alleged contract entered into between himself and the Sutton Company, the other by Dr. Dempsey C. Iles, claiming a three-fourth interest in the consideration received and to be received by the plaintiff for his assignment of the leases, in accordance with his contract with the plaintiff.

Intervenor Burton also adopted the allegations of facts contained in plaintiff's petition and alleged further that during the month of October or November of 1937 he entered into a verbal contract with the Sutton Company whereby it was agreed that the Sabine leases would be developed together with certain other leases owned by him in the Vinton area for their joint benefit, the cost of which was to be paid out of the surplus accumulated by them

from the joint development of certain leases in Cameron Parish and known as the "Sutton Joint Account"; that both the Vinton lease and the Sabine leases were drilled by the Sutton Company, the former resulting in a dry hole, while the latter is now producing, but that the Sutton Company refuses to recognize his interest in the production under the Sabine leases. In the alternative he alleges that in the event the Sabine leases are legally vested in and owned by the Zwolle Company, the title thereto was acquired by the company without his knowledge, but with full knowledge on the part of the company of his (intervenor's) ownership of an undivided half interest in the entire production of all oil, gas, or other minerals produced and which may be produced under the said leases. The prayer of his petition is in accordance with his allegations.

Intervenor Iles, briefly stated, made the following allegations: That he entered into a verbal agreement with plaintiff to procure the Sabine leases; that under this agreement the leases were to be placed in intervenor's name and that out of the profit made from the sale of such leases plaintiff was to receive one-fourth thereof and intervenor three-fourths; that in fraud of said agreement plaintiff had the leases placed in his own name and refused to recognize intervenor's interest in whatever consideration has been paid and is due from his assignment of the Sabine leases, and prayed for relief accordingly.

Defendants, after the trial judge had disposed of the exceptions of no cause and no right of action filed by the Sutton

Company, answered the main suit and all of the interventions denying generally and specifically all of the allegations of fact which set out a cause of action. In answer to plaintiff's suit they admitted that Sutton, Boudreau, and Stone constituted the sole membership of the board of directors of both the Sutton Company and the Zwolle Company; that some of the funds of the Sutton Company were used in defraying the expenses of procuring the leases and also of drilling same, but they averred that this was done for convenience until the Zwolle Company was organized and that all of the funds so expended were merely advanced by the Sutton Company and charged to the Zwolle Company account, and that such advances were for the individual account of the said Sutton, Boudreau, and Stone, all of which was later refunded. They specifically denied that the plaintiff was ever the owner of the Sabine leases, but averred, on the contrary, that he was employed by the defendants Sutton, Boudreau, and Stone to procure for them, as individuals, these leases, for which they paid his expenses, furnished the money to pay the bonuses to the lessors, and paid him the sum of $770, being 10¢ per acre for 7,700 acres that he had agreed to procure, and that they also agreed to pay him an additional sum of $4,000 if and when oil, gas, and other minerals were produced from the leases. They further averred that the plaintiff, in executing the document dated October 25, 1937, knew that the leases were being assigned to them as individuals and not as officers or directors of the Sutton Company, and that the same were to be developed by a corporation to

be organized and known as the Sutton-Zwolle Company, Incorporated, and that prior to executing the same he not only read the document, but assisted in making some changes in the descriptions contained therein.

Defendants Zwolle Company, Sutton, Boudreau, and Stone reconvened, seeking to correct the description of the property in the assignment of the lease obtained from the Mansfield Lumber Company and also an error in the assignment of the W. H. H. Moores lease wherein R. L. Gay was named as lessor instead of W. H. H. Moores. They also asked to be relieved of the $4,000 oil payment to be made to the plaintiff under their contract with him, until such time as the plaintiff complies with his contract to procure and assign leases upon 1,080 additional acres for which he had been paid and which he failed to procure.

Their answers to the interventions filed by Menuet and Burton are substantially the same as that made to plaintiff's demand, with the addition that they denied the misuse of any of the Sutton Company funds or that any contract was ever entered into between Burton and the Sutton Company for the development and operation of the Sabine leases, though they do allege that an invitation was extended by the Zwolle Company to Burton to join it in the development of the leases in line with the provisions under which the Cameron leases were being developed, which invitation was declined by him.

To the intervention of Dr. Dempsey C. Iles, they denied any contract with him or knowledge of any interest he may have had with plaintiff in procuring the leases. Answers were also filed by plaintiff and intervenor Burton to the intervention of Iles, denying his claims.

At the conclusion of the trial of the case and after counsel for plaintiff and intervenors had submitted their briefs, but before counsel for defendants had filed theirs, some thirty of the stockholders of the Sutton Company intervened in these proceedings alleging that after hearing the evidence of the case they were convinced that it was to the best interest of the stockholders of the Sutton Company to have the Sabine leases developed by the Zwolle Company and prayed that the intervention of Menuet be disallowed and dismissed. The petition to disallow the intervention of Menuet was dismissed and stricken from the record. No appeal was taken from this ruling of the trial judge.

There was judgment in the lower court denying plaintiff's claim for the $50,000 oil payment, but the court did render judgment in favor of plaintiff and of intervenors Menuet and Burton, ordering the cancellation of the assignment of the Sabine leases by the plaintiff to the defendants Sutton, Boudreau, and Stone, dated October 25, 1937, and the assignment of the same by them to the Zwolle Company, dated February 3, 1938; decreeing the Sutton Company to be the owner of the said leases and also recognizing the rights of William T. Burton to an undivided half interest in the production under said leases in accordance with his alleged contract for the development of the same under the

Sutton Joint Account; and the court reserving to the Zwolle Company its legal rights against the Sutton Company to recover actual and necessary expenditures by it in acquiring and developing the leases, and to the Sutton Company its rights to be reimbursed from the Sutton Joint Account all amounts expended by it in operating the said leases. The claim of intervenor Iles was dismissed. Defendants Sutton Company, Zwolle Company, Sutton, Boudreau, and Stone, and also intervenor Iles, have appealed. Plaintiff neither appealed nor answered the appeal.

Counsel for defendants contend and seriously argue that the exceptions of no cause and no right of action filed by the defendant Sutton Company should have been maintained by the lower court and which, if maintained, would dispose of the entire case, as the interventions were filed after the exceptions had been submitted and argued.

■ The basis of the exceptions is that this is primarily an action for specific performance to compel the Sutton Company to accept an assignment of the Sabine leases which, the exceptor contends, under the allegations of plaintiff's petition, he is unable to assign for the reason that the, title to these leases is vested in a third party, the Zwolle Company. In support of their contention they rely on the well settled principle of law that in an action for specific performance the courts will decline to grant the relief sought if the title is suggestive of litigation. Counsel for defendants further contend, as to plaintiff's claim for $50,000, that inasmuch as plaintiff's petition

contains no allegation that oil was being produced at the time this suit was filed, the exceptor cannot be compelled to pay the amount until the oil is produced in sufficient quantities to pay the same.

■ The trial judge, in his written reasons for judgment overruling the exceptions, gave a thorough analysis of the pertinent authorities and their applicability to the issues involved here, in which we concur, and concluded that " * * * under the allegations in the petition this situation arose by reason of the alleged fraudulent acts and a conspiracy of these individuals acting in their capacity as directors of the J. G. Sutton Oil Co. Inc., and also as a result of alleged fraud and a conspiracy of Sutton, Boudreau and Stone, as individuals, and also as directors of the Sutton-Zwolle Oil Co. Inc., * * * to prevent this plaintiff from enforcing his rights under his alleged contract with the J. G. Sutton Oil Co. Inc., and his failure to comply is therefore excusable * * *." The court also ' concluded that the plaintiff's claim to the $50,000 oil payment was not to enforce the payment of the $50,000 oil payment, but to have his right thereto as a consideration for his transfer of the leases ' recognized.

■ On the merits the only evidence supporting plaintiff's claim that in executing the document dated October 25, 1937, he intended thereby to assign the leases to the Sutton Company and not to Sutton, Boudreau, and Stone, is that of the plaintiff himself. In this he is neither supported nor corroborated by the testimony of anyone. In fact, the record unmistakably

shows the contrary to be true. His testimony is not only contradicted by that of Sutton, Boudreau, Stone, Johnson Sutton (son of J. G. Sutton), Betty Alford (Stone's secretary), and others, but we find in the record evidence of a meeting held in Mr. Stone's office on October 15, 1937, between Sutton, Boudreau, Stone, and Burton, in the presence of the plaintiff, wherein the development of the leases in controversy was discussed and a tentative agreement entered into, a synopsis of which was submitted in the form of a letter by Stone to Burton's attorneys, Cline, Thompson, and Lawes. In that letter, written at an unsuspicious time, it was stated:

*"We are about to have assigned to Mr. J. G. Sutton, Mr. Robert Boudreau and the writer mineral leases*
\* \* \*

"It is proposed that the following agreement be entered into between Mr. Burton as One party and *Messrs. Sutton, Boudreau and myself as the other party in line with the 'Sutton Joint Account' agreement, in Hackberry* \* \* \*." (Italics ours.)

In the same letter we find the significant statement "We have agreed with Mr. H. D. Eastman, Geologist of Shreveport to locate a well, examine cores \* \* \*." The record reveals that such a contract was entered into and signed "Sutton-Zwolle Oil Company by J. G. Sutton, President," to which plaintiff affixed his signature as a witness. Mr. R. L. Gay of Zwolle, who assisted plaintiff in procuring the leases, and to whom he agreed to pay half of whatever he received in selling the same, testified

that plaintiff, a few days after his visit to Mr. Eastman's office in Shreveport on October 19, told him of the contract having been executed between Mr. Eastman and the Zwolle Company, and later informed him that the leases had been assigned to Sutton, Boudreau, and Stone.

On October 25, 1937, the same day that he executed the assignment of the Sabine leases to Sutton, Boudreau, and Stone, plaintiff executed assignments of his escrow agreement with the Long Bell Lumber Company, and, on the 29th, his lease from the Bowman Hicks Lumber Company, in the following language inserted at the bottom of each document in long hand: "Rights given above to undersigned, *assigned to J. G. Sutton, Robert Boudreau and Robert R. Stone or their assigns* this day for consideration named in assignment of mineral leases made this day." (Italics ours.) Plaintiff admits executing these two assignments and has not satisfactorily explained them.

Though plaintiff alleged in his petition, and so testified, that he had never heard of the Sutton-Zwolle Oil Company, Incorporated, until March 4, 1938, in addition to the foregoing concrete evidence to the contrary, the record reveals that he actually signed the charter papers of the company as a witness.

Counsel for defendants, relying on the authority of the cases of Erskine v. Gardiner, 162 La. 83, 110 So. 97; St. Bernard Trappers' Ass'n Inc. v. Michel, 162 La. 366, 110 So. 617; Besson v. Mayor, Etc., of Donaldsonville, 49 La.Ann. 273, 21 So. 262; Gorman v. Gorman, 158 La. 274, 103 So.

766; Walmsley, Carver & Co. v. Geo. Whitfield, Airey & Colton, 24 La.Ann. 258; and Barron v. Jacobs, 38 La.Ann. 370, urged that the dismissal of plaintiff's demands carries with it the dismissal of the interventions.

But counsel for plaintiff and intervenors Menuet and Burton contend, and in which they are supported by the trial judge's opinion, that Sutton, Boudreau, and Stone, being directors and officers of the Sutton Company, had no legal right or capacity to acquire the leases for their own private and individual benefit. In his written reasons for judgment the trial judge said: "In the consideration of this particular inquiry, *the Court is not concerned as to whether the Sabine leases were in fact assigned to and acquired by the three named individuals or were assigned to and acquired by the said Sutton Company. Our inquiry just now is whether under the evidence as disclosed in the record of this case, the three named individuals had the legal right or capacity to acquire the said leases for their own private individual benefit.*" (Italics ours.)

In support of their contention, counsel rely on numerous excerpts quoted from Fletcher's Cyclopedia Corporation, Corpus Juris, and from a few Louisiana cases, particularly the following quotation from Section 861 of Fletcher's Cyclopedia Corporation:

"The general rule is that a director or other corporate officer cannot acquire an interest adverse to that of the corporation, while acting for the corporation or when dealing individually with third persons, and if he acquires an interest in an estate in which the corporation already has an existing interest, or where he acquires an interest outside, which the corporation had contemplated and desired acquiring, by overreaching the corporation, or taking advantage of knowledge which he has as an officer of it, such acquisition will be taken to be for the benefit of the corporation. That is to say property purchased by corporate officers in their own name, but with corporate funds, is impressed with a trust in favor of corporate creditors. They cannot have or acquire any personal or pecuniary interest in conflict with their duty as such trustees.' "

■ In reading Section 861 in its entirety, we find that the author further stated that " '*Whether in any case an officer of a corporation is in duty bound to purchase property for the corporation, or to refrain from purchasing property for himself, depends upon whether the corporation has an interest, actual or in expectancy, in the property, or whether the purchase of the property by the officer or director may hinder or defeat the plans and purposes of the corporation in the carrying on or development of the legitimate business for which it was created.*' " See, also, 14a C.J. 1883, at page 116. Moreover, it is stated by the same authority in an earlier edition that, "Except for a few straggling cases, of more or less doubtful authority, it is well settled in nearly all jurisdictions that transactions or contracts wherein a director or other corporate officer is inter-

ested adversely to the corporation are not void, but are merely voidable at the option of the corporation * * *." Section 2333, Volume 4. (Italics ours.)

Also in Volume 4 of the earlier edition by the same authority, we find the following pertinent statements:

(a) Under the title "Acquiring Adverse Title or Interests."

"The general rule is that a director or other corporate officer cannot acquire an interest adverse to that of the corporation, while acting for the corporation or when dealing individually with third persons. It has been said that 'in general the legal restrictions which rest upon such officers in their acquisitions are generally limited to property wherein the corporation has an interest already existing, or in which it has an expectancy growing out of an existing right, or to cases where the officers' interference will in some degree balk the corporation in effecting the purposes of its creation.'

\* \* \*

"Whether in any case an officer of a corporation is in duty bound to purchase property for the corporation, or to refrain from purchasing property for himself, depends upon whether the corporation has an interest, actual or in expectancy, in the property, or whether the purchase of the property by the officer or director may hinder or defeat the plans and purposes of the corporation in the carrying on or development of the legitimate business for which it was created." Section 2281.

See, also, Section 861, vol. 3, Permanent Edition.

(b) Under the title "Limitations of and Exceptions to the Rule."

"There is a vast field for individual activity lying outside the duty of a director, yet well within the general scope of the corporation's business.

*"The test seems to be whether there was a specific duty on the part of the officer sought to be held liable, to act or contract in regard to the particular matter as the representative of the corporation—all of which is largely a question of fact.* If there is no such duty, then the director or other corporate officer may acquire outside interests, although the corporation may be more or less interested." Section 2282. (Italics ours.)

See, also, Section 862, vol. 3, Permanent Edition.

(c) Under the title "Profits Made by Officer."

*"The doctrine that a director or other officer of a corporation cannot obtain a profit or advantage in dealings on behalf of the corporation only applies where the officer is acting for the corporation or for some other reason owes a duty to the corporation which is inconsistent with his obtaining the profit or advantage."* Section 2304. (Italics ours.)

See, also, Section 885, vol. 3, Permanent Edition.

A review of the record reveals that the overwhelming preponderance of the evi-

dence shows that it was never contemplated that the leases in controversy were acquired for the benefit of or to be developed by the Sutton Company, or that there was any duty on the part of Sutton, Boudreau, and Stone to do so, but that at all times the defendants Sutton, Boudreau, and Stone, as individuals, were seeking to have intervenor Burton join them to develop the leases under an agreement in line with his contract with the Sutton Company known as the Cameron contract, which, in effect, is that they were to contribute the leases and Burton was to pay for the operation of the first well, etc., and that not until about February 23, 1938, when their numerous efforts to have Burton join them as above proposed had failed and they had spent more than $29,000 of the Sutton Company's funds in order to carry out the obligations of the lease contracts, that, in their desperation for financial assistance, they consented that the leases might be developed by the Sutton Company in a manner proposed by the intervenor Burton, that is, on an extension of the Cameron contract between himself and the Sutton Company, the expenses of which were to be defrayed out of the accumulations thereunder known as the "Sutton Joint Account." This is borne out by the positive testimony of Sutton, Boudreau, and Stone and other evidence, particularly by letters written by Mr. Stone at unsuspicious times. The testimony of intervenor Burton also fortifies this conclusion. To illustrate we quote from his testimony as follows:

"Q. What, Mr. Burton, was the first connection, if you had any at all, with what we call here the Sabine leases, or the Zwolle prospect? A. Well, *Mr. Stone called me several times,* and if I remember right met me once or twice, and asked me or mentioned about a block up there in Sabine Parish near Zwolle, and asked me to come in with him.

"Q. Come in with whom? A. With the J. G. Sutton Oil Company.

"Q. Now, about when was that, if you recall, Mr. Burton? A. Well, that, if I remember correctly, was some time along in October. *Several times, if I remember correctly,* it was mentioned, and I told him that I was *awful busy* and couldn't get to it at the time, *but we finally got together.*"

Mr. Burton, after testifying that he had instructed his attorney to tear up the synopsis prepared by Mr. Stone after their first meeting on October 15, 1937, further testified:

"Q. How long after that, about did you talk to Mr. J. G. Sutton? A. Well, Mr. Sutton, I think I ran into him a time or two around the Weber Building. I think he was in Mr. Cline's office one day when I came out of your office, *and I met him in the hall several times after that.* I told them I didn't propose to be fooled by this bunch. So, Mr. Sutton *finally* persuaded me to come in.

"Q. How were you to come in, individually, with the joint account or with whom? A. Sutton Oil Company, joint account. It was thoroughly understood that it was to be the joint account. I told him then that there must be no organizing, and no selling of stock and I didn't want any shenanigans

going on, no monkey business. *I told them that I was busy. I said, if you want to drill under the joint account, all right, but I didn't want any stock promotion schemes, and if there was just to count me out."*

Under cross-examination, Mr. Burton further testified as follows:

"Q. Mr. Burton, how soon after your visit to Mr. Stone's office, where you met him and Mr. Boudreau, was it that Major Thompson read over the 'phone to you a letter that he had received from Mr. Stone? A. A few days, Captain—I don't recall just how soon it was.

"Q. It was within a reasonable short time? A. Within a week I would say, yes, sir.

"Q. Now, Mr. Burton, do you remember meeting Mr. Sutton and Mr. Boudreau on the 5th floor of the Weber Building a few days after that letter was written, in which you told them in substance, not the exact words, *that you were not interested in that;* that you could get all the prospects you wanted by paying the cost of the first well? A. Yes—I told them I had hundreds of thousands of acres of my own that I could drill. *That I wasn't interested in putting up all the funds.*

"Q. That was a few days after Major Thompson had read this letter to you over the 'phone? A. Yes—*They were begging me to come in.*

"Q. So you turned it down upon the proposition that had been submitted to you? A. *Yes."*

(All italics throughout testimony ours.)

This leaves for our consideration, therefore, whether or not the final negotiations of February 23, 1938, culminated in an enforceable contract.

At that time the Zwolle Company had been organized and the Sabine leases assigned to it and $6,600 of its capital stock had been sold to various individuals. According to the record some of the conditions imposed by intervenor Burton in their agreement were that the leases be transferred from the Zwolle Company to the Sutton Company; that the subscribers to the capital stock of the Zwolle Company be refunded the amount of their subscriptions and the receipts therefor obtained from each subscriber; and also that the invoices, pay rolls, and statements of expenses for the drilling operations be submitted to Burton's auditor, Maxwell, for approval and payment out of the Sutton Joint Account, if found in line.

Payment of the invoices, pay rolls, and other expenses of operation was refused by Maxwell when presented for payment by J. G. Sutton. Burton testified that he instructed Maxwell not to pay the bills when Maxwell informed him that defendant Boudreau was in the town of Sulphur trying to sell stock in the Zwolle Company, but he also stated that he did not intend thereby to withdraw from his agreement. Dr. Brooks testified that at about that time Burton told him in his (Burton's) office that he was not interested in the operations in Zwolle. This, however, is denied by Burton. There are in the record, in addition to the testimony of Sutton, Boudreau, and Stone, strong corrobo-

rating circumstances favoring defendants' position. The leases were never transferred to the Sutton Company, nor were the subscribers to the capital stock of the Zwolle Company ever refunded the amount of their subscriptions. Instead more stock was sold until, at the time of the trial of the case, the subscriptions amounted to approximately $35,000, not including the amount subscribed by Sutton, Boudreau, and Stone, nor the amount issued to the Sutton Company, and out of this amount all of the expenses of operation, beginning from and after the first of February, long before the well came in as a producer, were paid.

It is our conclusion, therefore, that intervenor Burton has failed to bear the burden of establishing that an enforceable contract was ever consummated between himself on the one hand and the Sutton Company on the other hand.

■ This brings up for consideration the intervention of Iles. The trial judge, in disposing of this intervenor's claim, stated, after carefully reviewing the record, that he could not find satisfactory evidence that an enforceable contract existed between the plaintiff and intervenor. A rehearing was applied for by intervenor Iles and after argument the trial judge, in a well considered written opinion, again concluded that this intervenor had failed to prove his case with the legal certainty the law required. Our review of the case has brought us to the same conclusion.

We will now discuss the reconventional demands of the defendants Sutton, Boudreau, Stone, and the Zwolle Company.

These defendants claim that the plaintiff, in executing the assignment of the Sabine leases to Sutton, Boudreau, and Stone, incorrectly described the property of the Mansfield Hardwood Lumber Company as being the North Half of the Southeast Quarter instead of the North Half of the Southwest Quarter of Section 21, and the West Half of the Southeast Quarter instead of the West Half of the Southwest Quarter of Section 28, Township 7 North, Range 14 West, Louisiana Meridian; that in the W. H. H. Moores lease he erroneously inserted the name of R. L. Gay as the lessor instead of W. H. H. Moores, and that the assignments should be corrected accordingly; and that they should be absolved from the $4,000 oil payment under their contract with plaintiff until he procures and assigns to them 1,080 additional acres which he had agreed to procure and for which he had been paid.

■ In so far as we have been able to find, the original lease or a copy thereof from the Mansfield Hardwood Lumber Company is not in the record, nor is there any evidence to show that the description given in the assignment of the lease is an error. We will, therefore, non-suit the defendants and plaintiffs in reconvention on this claim.

The record does show, however, that in assigning the lease from W. H. H. Moores, R. L. Gay was erroneously named as the lessor.

■ As to the reconventional demand that they be absolved from the $4,000 oil payment in accordance with their contract with plaintiff until he procures and assigns

to them 1,080 additional acres which he had agreed to procure and for which he had been paid, our opinion is that the evidence does not satisfactorily establish the fact that there was an agreement to procure any definite acreage, or that plaintiff was being paid at the rate of 10¢ per acre instead of $770 cash, as recited in the assignment.

For the reasons assigned the judgment of the lower court will be amended to read as follows:

It is ordered, adjudged, and decreed that there be judgment in favor of defendants J. G. Sutton, Robert J. Boudreau, Robert R. Stone, the Sutton-Zwolle Oil Company, Incorporated, and the J. G. Sutton Oil Company, Incorporated, and against plaintiff Charles H. Lawrence, Jr., and intervenors Lawrence G. Menuet, William T. Burton, and Dr. Dempsey C. Iles, dismissing their respective claims at their cost.

It is further ordered, adjudged, and decreed that there be judgment on the reconventional demands of the defendants J. G. Sutton, Robert J. Boudreau, Robert R. Stone, and the Sutton-Zwolle Oil Company, Incorporated decreeing that in the assignment of the leases by plaintiff on October 25, 1937, the name of W. H. H. Moores be inserted for that of R. L. Gay; that their claim for the correction of the description in the assignment of the lease from the Mansfield Hardwood Lumber Company be non-suited; and that their claim to be relieved of the $4,000 oil payment is dismissed.

HIGGINS, J., absent.